# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00770-COA

**JUSTINE LYNN NATIONS A/K/A JUSTINE SAVELL NATIONS A/K/A LYNN A/K/A JUSTIN LYNN NATIONS A/K/A JUSTINE NATIONS A/K/A JUSTINE L. NATIONS A/K/A JUSTINE LYNN MCCURDY A/K/A JUSTINE MCCURDY**                          APPELLANT

v.

**STATE OF MISSISSIPPI**                                                                 APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 04/08/2015 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KEVIN D. CAMP |
| | JOEL C. REYNOLDS JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA BYRD |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF GRAND LARCENY AND SENTENCED AS A HABITUAL OFFENDER TO TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 08/23/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., WILSON AND GREENLEE, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Justine Nations was convicted of grand larceny by a Rankin County jury and sentenced as a habitual offender. On appeal, Nations argues that the circuit court erroneously allowed the State to amend her indictment to charge her as a habitual offender and to amend

the items allegedly stolen.  She also claims that her sentence exceeds the maximum allowed by statute at the time of her conviction and that the State "violated her rights" by offering plea bargains that exceeded the statutory maximum punishment for grand larceny.  We find no reversible error and therefore affirm Nations's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.     After falling and injuring her hip in August 2013, Carolyn Baldwin was hospitalized multiple times and had hip replacement surgery.  During this period, on November 4, 2013, Baldwin's husband passed away.  When Baldwin returned to the hospital after his death, she had no one to take care of her home and pets.  Baldwin hired Nations to stay with her at her home, to assist her while she recuperated, to care for her pets, and to take care of her house generally.  Baldwin hired Nations based on a recommendation from Nations's mother, who was a neighbor of Baldwin's.  While Baldwin was still in the hospital, she spoke with Nations by phone to make arrangements, and in late November 2013, before Baldwin was released from the hospital, Nations moved into her home to care for the pets and the house. In exchange for Nations's services, Baldwin provided room and board and occasionally paid some of Nations's bills.  This arrangement continued until mid-February 2014, when Baldwin fired Nations.

¶3.     In March 2014, Baldwin noticed some of her belongings were missing, including several pieces of jewelry.  She contacted law enforcement and reported three necklaces, two tennis bracelets, and several rings as missing.  She provided investigators with photographs of her wearing the jewelry and names of people who had been in her home in recent months.

2

Investigator Brad Smith of the Rankin County Sheriff's Department ran the names through an online pawn shop database called Leads Online. He discovered that Nations recently had pawned women's jewelry at three nearby pawnshops. Investigator Smith went to each pawn shop and compared the items Nations had pawned to photographs provided by Baldwin. He was able to recover several items that Baldwin had reported missing.

¶4. Nations agreed to an interview with Investigator Smith and waived her *Miranda*[1] rights. Nations brought one of Baldwin's tennis bracelets to the interview and admitted that she had pawned other pieces of jewelry, but she claimed that Baldwin gave it all to her. Nations also told Investigator Smith that the jewelry was "bunk," meaning not valuable. Nations was unable to explain how she had been able to pawn jewelry that had little or no value. At the end of the interview, Investigator Smith arrested Nations. On June 5, 2014, Nations was indicted by a grand jury for stealing

> one (1) diamond ring with diamond clusters, one (1) gas generator, one (1) pair of diamond cross earrings, one (1) pair of gold hoop earrings, two (2) tool boxes with tools, two (2) pair of dog grooming scissors, two (2) tennis bracelets, one (1) ruby diamond necklace and one (1) horse shoe ring crafted into a necklace, valued at Five hundred ($500.00) or more

in violation of Mississippi Code Annotated section 97-17-41 (Rev. 2013).

¶5. On January 6, 2015, the State moved to amend the indictment to charge Nations as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2015). The State's motion was granted prior to trial on April 1, 2015. On March 17, 2015, the State moved to amend the indictment to strike certain items identified as having been stolen from

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Baldwin and to change the description of certain other items. This motion was granted after a hearing on March 24, 2015. The indictment thus was amended as shown by the following deletions and addition (in brackets):

> one (1) diamond ring with diamond clusters, one (1) gas generator, one (1) pair of diamond cross earrings, one (1) pair of gold hoop earrings, two (2) tool boxes with tools, two (2) pair of dog grooming scissors, two (2) tennis bracelets, one (1) ruby [pave heart] diamond necklace and one (1) horse shoe ring crafted into a necklace, valued at Five hundred ($500.00) or more . . . .

¶6.    Trial began on April 7, 2015. Baldwin testified and confirmed that the pieces of jewelry that Investigator Smith recovered—a pair of diamond cross earrings, one pave heart pendant, one diamond ring, and two tennis bracelets—belonged to her. Photographs of Baldwin wearing the jewelry were admitted into evidence. Baldwin testified that she did not know when the items were taken or whether they were taken at different times; once she discovered that some of the items were missing, she realized that several others were also missing.

¶7.    An employee from each pawn shop testified about the items that Nations pawned. An employee from DJ Silver Mine pawn shop testified that Nations pawned a 14-karat white gold ring and a gold bracelet on January 15, 2014. Nations did not sell the jewelry outright but instead took a $120 loan for the items. Investigator Smith recovered the ring and matched it to photographs provided to him by Baldwin.[2] The pawn shop employee estimated that the ring had a $60 pawn value. The employee explained the loan process as follows:

---

[2] This bracelet was not recovered because it did not fit the description of any of Baldwin's bracelets; Investigator Smith testified that Baldwin told him this bracelet was not hers.

4

"Most of the time when somebody comes in, . . . we ask them 'How much [money] do you need to borrow[?]' . . . And most of the time if they give us an amount, we throw [the pawned items] on the scales and as long as we're covered we loan them what they ask for."

¶8. An employee from USA Pawn in Pearl testified that Nations pawned a pair of earrings and a heart pendant on March 12, 2014. Investigator Smith recovered the items and matched them to photographs Baldwin had provided to him of her missing diamond cross earrings and heart pendant. Nations received a $100 loan for these items. The pawn shop employee testified that the store determines the value of gold jewelry based on the price of gold on that day, so the $100 loan was dependent on the weight of the jewelry and the gold price of the day. He was unable to give a specific value of the jewelry but testified that the value of the jewelry was more than $100 because the pawn shop needed a profit margin.

¶9. Finally, an employee from USA Pawn on McDowell Road testified that Nations pawned a 14-karat yellow gold bracelet on March 17, 2014, and received a $450 loan. Again, Investigator Smith recovered the bracelet and matched it to photographs provided by Baldwin. The pawn shop employee testified that when a customer pawned gold jewelry, the shop weighed the jewelry and calculated its worth based on that day's gold prices. The shop will loan the customer up to seventy-five percent of the jewelry's value. The shop may adjust the calculated value if the jewelry includes other items of value, such as diamonds. Thus, although the employee could not give a specific value of the bracelet at the time of the pawn, she did testify that the value of the bracelet was more than the $450 loaned to Nations and "definitely" in excess of $500.

¶10. After the State rested, the defense moved for a directed verdict, arguing that the State could not aggregate the value of the jewelry to establish the $500 statutory threshold. This motion was denied. Nations then testified and claimed that Baldwin had given her the jewelry she pawned. At the close of the evidence, the defense renewed its motion for a directed verdict, which was again denied. The jury found Nations guilty of grand larceny.

¶11. At sentencing, the State introduced evidence of Nations's prior convictions with no objection from the defense. Nations's prior convictions included a 2008 conviction for burglary of a dwelling and a 2010 conviction for uttering a forgery. The defense presented no argument during sentencing, and the circuit court accepted the State's evidence and found Nations to be a habitual offender under section 99-19-81. The judge then sentenced Nations to serve ten years in the custody of the Mississippi Department of Corrections and ordered her to pay $831.50 in court costs and fees, $550 in restitution to USA Pawn, and $60 in restitution to DJ Silver Mine. Nations now appeals.

## DISCUSSION

¶12. On appeal, Nations argues that the trial court erred by: (1) allowing the State to amend the indictment to include her habitual offender status; (2) allowing the State to amend the indictment to remove or alter the descriptions of items allegedly stolen; (3) permitting the State to aggregate the value of the allegedly stolen items; and (4) sentencing her to ten years' imprisonment. Nations also argues that the State violated her rights by offering plea deals that exceeded the statutory maximum sentence at the time of her conviction. Finding no error, we affirm Nations's conviction and sentence.

## I. Habitual Offender Amendment

¶13. Although Nations has never disputed—and, in fact, conceded—her status as a habitual offender under section 99-19-81, she argues that the circuit court erred by permitting the State to amend the indictment to bring that charge. Specifically, quoting *Forkner v. State*, 902 So. 2d 615, 624 (¶28) (Miss. Ct. App. 2004), Nations argues: "It is 'permissible to amend the indictment . . . and to charge the defendant as a habitual criminal under [Mississippi Code Annotated section] 99-19-83,[3] when defense counsel is aware of the State's intentions and the defendant is fully aware of the State's intentions during plea negotiations.'" Nations's Br. at 5 (ellipsis inserted by Nations).

¶14. Nations's reliance on this selective quotation from *Forkner* is misplaced. To begin with, the words that Nations replaces with an ellipsis are actually quite important—*Forkner* held that it was "permissible to amend the indictment *on the date of trial* and to charge the defendant as a habitual criminal . . . ." *Id.* (emphasis added). In *Forkner*, we held that the defendant was provided sufficient notice of the amendment and a fair opportunity to present a defense even though the State notified him of its intent to amend the indictment the week before trial and filed a motion to amend the indictment only *one day* before trial. *See id.* at 624-25 (¶¶28-29) (citing URCCC 7.09). More recently, in *Williams v. State*, 131 So. 3d 1174 (Miss. 2014), the Supreme Court held that a motion to amend the defendant's indictment filed three days prior to trial provided sufficient notice of the State's intent to charge him as a habitual offender. *Id.* at 1177-78 (¶9). In this case, the State moved to amend Nations's

---

[3] As noted, Nations was charged under section 99-19-81, not section 99-19-83.

indictment four months before trial. Under the reasoning and holding of *Williams*, *Forkner*, and other decisions of this Court and the Supreme Court, the State provided Nations with ample notice of its intent to charge her as a habitual offender, and she had a fair opportunity to present any defense to that charge.

¶15.    Moreover, at the March 23, 2014 hearing on the State's motion to amend the indictment to charge her as a habitual offender, Nations's attorney specifically stated: "Your honor, we don't have any opposition [to the State's motion]. It's either—she's habitual or she's not. I think that we had already talked and she is in that status." After Nations's attorney's statement, the trial judge granted the State's motion. It is difficult to imagine a clearer waiver of the issue. Thus, Nations's claim of unfair surprise is not only without merit but also procedurally barred. *Newberry v. State*, 85 So. 3d 884, 888 (¶8) (Miss. Ct. App. 2011) (holding that a notice-based objection to a motion to amend an indictment to charge the defendant as a habitual offender is waived if the defendant fails to make a specific and contemporaneous objection). Accordingly, we find no error in the trial court's allowance of the amendment.

## II.    Stolen Items Amendment

¶16.    Nations also claims that the trial court erred by allowing the State to amend her indictment by removing and altering the stolen items listed on the indictment. We begin with two preliminary observations regarding this claim. First, prior to trial, Nations specifically disavowed any objection to at least one of the amendments. Her attorney stated: "If they want to describe something in more detail and as we talked about the pavet [sic] heart

8

diamond and just change the way it is and they've provided a photo, that's not a problem." A short time later, Nations's attorney reiterated that this amendment was "not a problem" and that he had "no objection" to it. Accordingly, Nations waived any objection to this specific amendment. *Newberry*, 85 So. 3d at 888 (¶8).

¶17. Second, Nations's appellate brief devotes no more than a page to this argument and fails to discuss relevant caselaw or the specific amendments to the indictment. Nations's perfunctory argument is inadequate to present the issue and could be rejected as procedurally barred for that reason alone. *See, e.g.*, *Patton v. State*, 109 So. 3d 66, 75 (¶¶21-22) (Miss. 2012); *Jefferson v. State*, 138 So. 3d 263, 265 (¶¶7-9) (Miss. Ct. App. 2014); *White v. State*, 87 So. 3d 487, 494 (¶33) (Miss. Ct. App. 2011); *Britt v. State*, 844 So. 2d 1180, 1183 (¶¶8-9) (Miss. Ct. App. 2003). Procedural bar notwithstanding, the issue is also without merit.

¶18. A criminal defendant has a constitutional right to be informed of the nature and essence of the charges against him. Miss. Const. art. 3, § 26; *Fulton v. State*, 146 So. 3d 975, 977 (¶6) (Miss. 2014) ("The purpose of an indictment is to furnish the accused such a description of the charges against him as will enable him to adequately prepare his defense." (internal quotation marks omitted)). The indictment must provide the accused with a "concise and clear statement of the elements of the crime charged." *Mixon v. State*, 921 So. 2d 275, 280 (¶13) (Miss. 2005) (quoting *King v. State*, 580 So. 2d 1182, 1185 (Miss. 1991)); *accord* URCCC 7.06. The trial court may permit the indictment to be amended, but "[s]uch amendments . . . may pertain to matters of form only, not matters of substance." *Mixon*, 921 So. 2d at 280 (¶15). "Amendments of substance include those which 'change the charge

made in the indictment to another crime.'" *Id.* (quoting *Shive v. State*, 507 So. 2d 898, 900 (Miss. 1987)).

¶19. However, "[i]n many instances, mere 'surplusage' may be stricken from an indictment without any prejudice to a defendant." *Lee v. State*, 944 So. 2d 35, 39-40 (¶14) (Miss. 2006) (footnote omitted). "The term 'surplusage' is defined as 'language that does not add meaning' and 'extraneous matter in a pleading.'" *Id.* at 39 n.3 (quoting Black's Law Dictionary 1172 (7th ed. 2000)). We apply "the following test for analyzing an amendment to an indictment for the purpose of removing surplusage":

> (1) the removal of the surplusage must not change the substance of the offense charged; (2) the defendant must be afforded a fair opportunity to present a defense and must not be unfairly surprised; (3) the removal of the surplusage must not materially alter the essential facts of the offense; and (4) the removal of the surplusage must not alter a defense under the original indictment.

*Id.* at 40 (¶16). Under this test, we conclude that the amendments to Nations's indictment were permissible.

¶20. In a prosecution for grand larceny, when "an indictment charges the theft of a certain number or quantity of things, the state may prove the theft of . . . a lesser number or quantity if the value of such number or quantity is sufficient to bring the crime within the grade of offense with which [the] accused is charged." *Grimsley v. State*, 215 Miss. 43, 48, 60 So. 2d 509, 511 (1952). Thus, in the present case, rather than moving to amend the indictment, the State could have simply proceeded to trial on the original indictment. A failure of proof as to some of the items listed in the original indictment would not have entitled Nations to a judgment of acquittal if—as the jury clearly found at trial—the State's proof showed that

10

the remaining items were worth $500 or more.

¶21.   With this in mind, we conclude that the items deleted from the indictment—the dog grooming scissors, the tool boxes and tools, the gas generator, and a certain ring and earrings (*see supra* ¶¶4-5)—were "mere surplusage" under the four-part test set out above.  First, the removal of these items did not change the substance of the offense, as the charge remained grand larceny.  Second, Nations was afforded a fair opportunity to defend herself and was not unfairly surprised.  Indeed, the amendment narrowed and clarified the charge against her and reduced the number of items on which the State could rely to meet its burden of proving that Nations took property worth at least $500.  Third, the amendment did not "alter the essential facts of the offense"; rather, it merely clarified and narrowed the essential facts. Finally, the deletion of the items did not eliminate any defense previously available to Nations.  *Lee*, 944 So. 2d at 40 (¶16).

¶22.   In *Stevens v. State*, 232 So. 2d 730, 730 (Miss. 1970), the Supreme Court found no error in a similar amendment to an indictment, albeit with little analysis.  There, "[t]he indictment originally charged the theft of many items of personal property," but "[a]t the trial, the district attorney asked to amend by eliminating all of said articles except four." *Id.* The defendant "claimed surprise and asked for a continuance," but the circuit "court permitted the amendment and overruled the motion for continuance."  *Id.*  The Supreme Court stated simply, "Of course, there was no error in this."  *Id.*[4]  The same is true here.

_____

[4] In the circuit court, Nations relied on the Supreme Court's decision in *Fulton*, 146 So. 3d at 978-80 (¶¶12-14), although she does not cite the case on appeal.  *Fulton* is not on point.  There, the Supreme Court held the trial court erred by allowing an amendment that deleted some items *and substituted others*, thereby "*completely changing* the stolen property

11

¶23. The only other amendment to the indictment was the change of "diamond ring with diamond clusters" to read simply "diamond ring." The prosecutor explained that he was requesting the amendment only because he was unsure whether the multiple diamonds embedded in the ring were properly characterized as "clusters." It is unclear whether Nations's argument on appeal is intended to challenge this amendment, as her brief does not mention the ring. In any event, this amendment was also permissible. The State is permitted to amend the indictment to correct "the description of any property or thing," provided the amendment is not material or prejudicial. Miss. Code Ann. § 99-17-13 (Rev. 2015); *see Jackson v. State*, 450 So. 2d 1081, 1082 (Miss. 1984) (explaining that "[t]he indictment could have been amended" to allege theft of "rib eye roasts" rather than "rib eye steak"); *Bennett v. State*, 211 So. 2d 520, 522 (Miss. 1968) (holding that the indictment was permissibly amended to change the description of a stolen watch); *Andrews v. State*, 220 Miss. 28, 31, 70 So. 2d 40, 41 (1954) (holding that the indictment was permissibly amended to change the brand name of the barbed wire stolen). Nations has not explained how the slight alteration of the description of the ring was material or prejudicial, and we conclude that it was not.

### III. Aggregation of Stolen Items

¶24. Nations also argues that the State was erroneously permitted to aggregate several alleged petit larcenies to establish one grand larceny. In her motion for a directed verdict, Nations acknowledged that there was testimony that one gold bracelet was worth at least $500 by itself, but she argued that the values of the others items could not be aggregated

alleged to have been received by the defendant." *Id.* at 979 (¶14) (emphasis added). Unlike *Fulton*, the amendment in this case did not add stolen items to the original indictment.

12

because there was no evidence that they were stolen as part of the same continuous transaction. As we appreciate the argument, she was essentially asking for a directed verdict that the alleged thefts of less valuable jewelry did not constitute grand larcenies and were not part of a comprehensive grand larceny. The State, however, contends that the grand larceny statute required aggregation of the values of all of the items.

¶25. At the time of Nations's offense, Mississippi Code Annotated section 97-17-41(1) (Rev. 2006) provided:

> Every person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of Five Hundred Dollars ($500.00) or more, shall be guilty of grand larceny, and shall be imprisoned in the Penitentiary for a term not exceeding ten (10) years; or shall be fined not more than Ten Thousand Dollars ($10,000.00), or both. *The total value of property taken and carried away by the person from a single victim shall be aggregated in determining the gravity of the offense.*

(Emphasis added). The emphasized sentence requiring aggregation was added in 2004. 2004 Miss. Laws ch. 526, § 7. Nations does not dispute that the statute requires aggregation of the value of all items taken from a single victim as part of a single theft, but citing *Ellis v. State*, 469 So. 2d 1256 (Miss. 1985), and *Patterson v. State*, 171 Miss. 1, 156 So. 595 (1934), she argues that aggregation is permissible only when the items were all taken as part of a single continuous transaction.

¶26. In *Ellis*, Charlie Ellis was convicted of grand larceny for stealing four butane heaters and two collection plates from a church. *Ellis*, 469 So. 2d at 1257. The church initially discovered that two heaters and the collection plates were missing and the next day discovered that two more heaters were missing. *Id.* Ellis claimed that he should not have

13

been indicted for one crime of stealing four heaters because the evidence at trial showed two separate crimes, each involving two heaters. *Id.* at 1260. The Supreme Court acknowledged that "several petty larcenies cannot be consolidated so as to constitute grand larceny," but the Court held that "where several takings constitute one continuous transaction it is grand larceny." *Id.* (citing *Dodson v. State*, 130 Miss. 137, 93 So. 579 (1922)). The Court continued, "It is clear from the evidence in this case that the two entries into the church—taking two heaters each time—by the defendant were for the primary purpose of stealing the four heaters which he hid in the woods, picked up at a later date, and sold." *Id.* Thus, the Court concluded, there was no error in Ellis's indictment as his taking of the heaters—even if on separate dates—amounted to one continuous transaction. *Id.*

¶27. In *Patterson*, V.E. Patterson was convicted of grand larceny for the theft of a "lot of mill brass and copper" parts owned by a lumber company. *Patterson*, 156 So. at 595. At trial, an employee of the company testified that he noticed parts missing on several occasions in July and August, meaning they were taken "at separate and distinct times." *Id.* The parts were also sold to a junk dealer at various times, and he kept no record of when he bought the various items. *Id.* In the aggregate, the parts were valued at more than $25 (the threshold for grand larceny at the time), but many parts were worth less than $25. *Id.* The Supreme Court held that the evidence presented at trial did not support the State's continuous transaction theory but instead suggested "separate and distinct larcenies." *Id.* at 596.

¶28. In *Dodson*, 130 Miss. 137, 93 So. 579, the Supreme Court found that multiple takings of fence posts were "the result of one design, or constituted one continuing transaction." *Id.*

14

at 580. The defendant in that case, J.W. Dodson, testified that he had cut and removed 2,300 wooden posts from land he leased and sold the posts to several different people. *Id.* Dodson claimed that he had an understanding with the lessor that he could cut and sell the posts as reimbursement for improvements he had made to the land. *Id.* Evidence at trial showed that each individual delivery of posts was worth only about $7—i.e., less than the $25 grand larceny threshold. *Id.* Dodson claimed that this evidence precluded his conviction for grand larceny, as there was no showing that the posts were taken and sold as part of a continuous transaction. However, the Supreme Court reasoned:

> We think the evidence tended to show that [the removal of the posts] was the result of one design, or constituted one continuing transaction, and was sufficent to justify the verdict of the jury in finding the appellant guilty of grand larceny. It is true the direct evidence for the state is silent on this question; there is only whatever inference of fact which may be reasonably drawn therefrom. But the evidence of the defendant himself, as witness in his own behalf, supplied the necessary direct proof that the cutting and removal of this timber was one continuing transaction. For the appellant admitted as much when he stated that he had . . . cut and removed and sold these posts and appropriated the proceeds to his own use for the purpose of reimbursing himself for the improvements made by him on the plantation . . . .

*Id.* Thus, the Supreme Court affirmed Dodson's conviction, as there was evidence that all of Dodson's takings were part of "one design and one continuing transaction." *Id.*

¶29. Though Nations argues that her conviction cannot be sustained under the foregoing reasoning, her reliance on this line of cases is misplaced. These cases permit aggregation of the values of all property taken as part of the same continuous transaction. In *Ellis*, two entries into the church on two different days were part of a single continuous transaction. *Ellis*, 469 So. 2d at 1260. And in *Dodson*, the takings were deemed part of one continuous

15

scheme or plan even though they occurred throughout "the winter of 1919-1920." *Dodson*, 93 So. at 580.

¶30. The evidence presented at trial did not suggest that Nations's theft of Baldwin's jewelry was anything other than a single continuous design and transaction. Nations herself claimed that Baldwin gave her all of the jewelry in a three-day period in January. Specifically, she claimed that Baldwin gave her the jewelry after she threatened to quit because she needed money. In addition, Nations acknowledged that she worked for Baldwin for less than three months from start to finish. Accordingly, there was sufficient evidence that Nations took the jewelry as part of "one design." *Dodson*, 93 So. at 580.

¶31. The State argues that *Ellis* and *Patterson* are no longer good law because the grand larceny statute was amended in 2004 to provide that "[t]he total value of property taken and carried away by the person from a single victim shall be aggregated in determining the gravity of the offense." Miss. Code Ann. § 97-17-41(1). In the State's view, it is now "statutorily required to aggregate" the values of all property stolen from a single victim regardless of when or how the property is taken. However, the statute can be interpreted as consistent with prior caselaw if "the offense" is understood to mean a one design or a continuous transaction. As we have explained above, Nations's conviction is consistent with the reasoning of *Ellis* and *Patterson*, so we need not reach the issue raised by the State.[5]

## IV. Sentence

---

[5] The State also suggests that aggregation was unnecessary based on proof that one of the stolen bracelets was worth more than $500 by itself. However, we cannot know whether the jury was persuaded that the bracelet pawned for $450 was actually worth $500 or instead returned a guilty verdict based on the aggregate value of multiple items.

16

¶32. Nations claims that she should have been sentenced to five years in prison based on amendments to section 97-17-41 that went into effect on July 1, 2014—after Nations's offense and indictment but before her sentencing. *See* 2014 Miss. Laws ch. 457, § 15 ("House Bill 585"). At the time of Nations's offense, section 97-17-41 provided for a maximum sentence of ten years' imprisonment if the defendant was convicted of taking away property valued at $500 or more. House Bill 585 amended the statute to provide for a five-year maximum sentence for thefts of property valued at $1,000 or more but less than $5,000.[6] Nations argues that this new five-year maximum sentence should apply to her case.

¶33. Nations's argument relies on *Daniels v. State*, 742 So. 2d 1140 (Miss. 1999), in which our Supreme Court interpreted Mississippi Code Annotated section 99-19-33 (Rev. 2015) to require "that when a statute is amended to provide for a lesser penalty, and the amendment takes effect before sentencing, the trial court must sentence according to the statute as amended." *Id.* at 1145 (¶17). However, the Supreme Court recently overruled *Daniels*'s interpretation of section 99-19-33. *Wilson v. State*, No. 2015-KA-00066-SCT, 2016 WL 3474533, at *16 (¶60) (Miss. June 23, 2016). In *Wilson*, the Court held that Mississippi Code Annotated section 99-19-1 (Rev. 2015) "clearly requires the trial court to sentence an offender under a sentencing statute in place *at the time of the crime*." *Id.* at *17 (¶61) (emphasis added). Accordingly, the circuit court properly sentenced Nations to ten years' imprisonment under the version of section 97-17-41 in effect at the time of her crime.

---

[6] As amended by House Bill 585, the theft of property worth less than $1,000 is petit larceny and punishable by a maximum sentence of six months in the county jail and a fine. Miss. Code Ann. § 97-17-43(1) (Rev. 2014).

### V.    Plea Negotiations

¶34.    Nations claims that the State "violated her rights" by offering her a plea agreement that exceeded the maximum statutory punishment for grand larceny.[7]  However, Nations offers no support for this claim.  The State "is encouraged to discuss and agree on pleas [that] may be entered by the defendant," but there is no requirement that it do so. URCCC 8.04(B)(1).  Nor is there any constitutional right to a plea bargain.  *Allman v. State*, 571 So. 2d 244, 254 (Miss. 1990) (citing *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977)).  This issue is without merit.

### CONCLUSION

¶35.    Nations's claims of error are without merit.  Accordingly, we affirm her sentence and conviction for grand larceny as a habitual offender.

¶36.    **THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OF CONVICTION OF GRAND LARCENY AND SENTENCE AS A HABITUAL OFFENDER OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR.  JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

---

[7] Nations appears to argue that the State offered plea bargains in excess of five years, which Nations has argued on appeal is the maximum punishment applicable to her offense. However, as discussed above, the statutory maximum applicable to Nations's case was ten years' imprisonment.